**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| Eva M. Stone | * | FILED ENTERED |
| 37 W Broadway St. – P.O. Box 1060 | * | LOGGED RECEIVED |
| Union Bridge, MD 21791 | * | |
| Carroll County | * | MAY 1 2 2020 |
| **Plaintiff** | * | AT BALTIMORE |
| | * | CLERK, U.S. DISTRICT COURT DISTRICT OF MARYLAND |
| v. | * | BY |
| | * | DEPUTY |
| | * | Civil Action Number: _____ |
| **Greater Baltimore Medical Center, Inc.** | * | |
| 6701 North Charles Street | * | |
| Baltimore, MD 21204 | * | |
| Baltimore County | * | |
| **Defendant** | * | |
| **serve on:** | * | Jury Trial Requested |
| John B. Chessare | * | |
| 6701 N. Charles Street | * | |
| Baltimore, MD 21204 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiff Eva M. Stone ("Ms. Stone") respectfully files this Complaint against her former employer, Defendant Greater Baltimore Medical Center, Inc. ("Defendant"), because she was discriminated against and retaliated against by Defendant in violation of the Americans with Disabilities Amendments Act, as amended ("ADA") and the Age Discrimination in Employment Act, as amended ("ADEA").

### STATEMENT OF FACTS

**I. PLAINTIFF**

1. Ms. Stone is an adult resident of the State of Maryland, Carroll County.

2. Ms. Stone was hired by Defendant as a manager of Defendant's Neonatal Intensive Care Unit ("NICU").

3. Ms. Stone is currently 71 years old.

4. At the time of her termination, Ms. Stone was more than 68 years old.

5. Ms. Stone was more than a satisfactory employee.

6. Ms. Stone never received any written discipline or counseling from Defendant prior to her suspension and termination in March 2017.

7. Ms. Stone received positive performance appraisals

8. Ms. Stone never received any unsatisfactory performance review.

9. Ms. Stone was well-liked by her colleagues as well as the staff who reported to her.

10. Ms. Stone was never advised that her performance was unsatisfactory or deficient.

11. Ms. Stone had a good attendance record.

12. Ms. Stone was never counseled or warned about any attendance issues or work performance problems.

13. In the final performance appraisal that Ms. Stone received before her termination, Defendant stated:

> ➢ "Eva treats everyone as she would like to be treated, respectfully and with courtesy… She has a good relationship with her staff and physician team"
> ➢ "Eva's approach is always honest, empathetic and integrity"
> ➢ "Eva goes above and beyond with respect to her role and responsibilities"
> ➢ "Eva has made great strides this year"
> ➢ "Eva has supported and mentor several staff member… promoting their individual growth and development. In turn the entire NICU team has benefited from this"
> ➢ "Eva takes the time and effort to recognize staff and her entire team when appropriate. Eva's performance evaluations are stellar and are an example on how to do it right"
> ➢ "She has focused on the task at hand and concentrated on a few great projects"

14. In the final performance appraisal, Ms. Stone received "Role Model" and "Solid Performer" ratings in each and every section.

15. Just weeks before her termination, Ms. Stone was nominated by one of Defendant's physicians for Defendant's "kindness award".

16. The nominating physician said the following about Ms. Stone:

> When I think of kindness at work the first person that comes to my mind is Eva Stone RN. She is the epitome of compassion, empathy, high moral character and fullness of heart and soul. Eva has been the manager of the NICU for the last several years. From the moment she took on the role, she exuded her natural instinct to not only give to others but to guide them to grow. Usually in leadership roles, this is expected, yet it is not always realized because a leader needs to be direct and firm and disciplinary. Eva took on this role but completely offered herself to the entire team, not only the staff nurses she managed, but the physicians and ancillary staff who have come to see her as "beloved" because of her ability to always approach with kindness and caring. Not only is this evident to staff and colleagues, but the patient's families describe her as a selfless giver who provides and manages some of the most difficult trials of their lives with selfless kindness and committed compassion …
>
> This past year, she was diagnosed with cancer herself. She still came to work and she still offered compassion and kindness. She stayed in touch with everyone during her treatment and still offered her guidance and support. She is fortunately on the mend but still sees to it that she offers hope and kindness to her team. To me this is what a kind and amazing leader does …
>
> I cannot think of anyone more deserving than Eva for this award and respectfully submit her name and story for recognition of kindness at GBMC.

## II. DEFENDANT

17. Defendant is a corporation that owns and operates a hospital by the name of Greater Baltimore Medical Center ("GBMC") in Maryland, Baltimore County.

18. GBMC was established in year 1965. http://gbmc50.com/.

19. Defendant's audited financials as of June 30, 2019 shows that Defendant worth is $10.474 Million in "cash" and "pledges". https://www.gbmc.org/annualreport/2019.

20. According to Defendant's website, GBMC is "342 – bed medical center" that "handles more than 23,000 admissions and over 52,000 emergency room visits annually." https://www.gbmc.org/about.

21. GBMC "employs approximately 3,900 people in clinical and non-clinical areas" and is "one of the largest private sector employers in Baltimore County." https://www.gbmc.org/about.

22. GBMC claims that it employs "nearly 1,100 physicians", "1,100 Medical Center nurses, and

more than 120 hospice nurses." https://www.gbmc.org/about.

## III. MS. STONE'S EMPLOYMENT & HER DISCRIMINATORY TERMINATION

23. Ms. Stone commenced her employment with Defendant in approximately October 2011 as its NICU manager.

24. Prior to her hire, Ms. Stone was interviewed by, among others, Defendant's former Chief Nursing Officer Jody Porter ("CNO Porter"), manager of pediatrics, Valerie Tighe, and manager of new-born nursery, Jody Bell.

25. Upon information and belief, CNO Porter made the decision to hire Ms. Stone.

26. CNO Porter left Defendant's employment sometime around 2014.

27. Almost all of Defendant's managers, who interviewed Ms. Stone and were instrumental in her hiring, were not involved in Defendant's subsequent discriminatory actions against her.

28. Ms. Stone performed very well in her NICU manager job.

29. In around June 2016, Ms. Stone's health care provider discovered an abnormal nodule on Ms. Stone's left upper lobe of her lung.

30. Since the nodule was right behind her heart, Ms. Stone could not be tested by way of biopsy.

31. Ms. Stone was subsequently placed on an intermittent FMLA leave for one year by her treater in order for needed medical care.

32. Following PET and CT scans, in approximately August 2016, Ms. Stone was diagnosed with lung cancer.

33. Due to the diagnosis, in or about the same month, Ms. Stone underwent a major lung surgery to remove the largest lobe of her lung.

34. Ms. Stone informed Defendant of the diagnosis and surgery.

35. Following the surgery, Ms. Stone was out of work on FMLA leave for six weeks.

4

36. Ms. Stone was released to work six weeks later, and she was on continued intermittent FMLA leave in order to attend to follow-ups and doctor's appointments.

37. Ms. Stone's intermitted FMLA leave order was valid through June 2017.

38. Because Ms. Stone had reduced lung capacity and experienced shortness of breath, she was required to carry and use a portable oxygen tank when at work.

39. Ms. Stone kept the portable oxygen tank in her office.

40. Ms. Stone's coworkers and managers were aware of the portable oxygen tank in Ms. Stone's office.

41. Whenever she experienced shortness of breath, Ms. Stone used the oxygen tank.

42. Defendant's managers were aware of Ms. Stone using the oxygen tank in her office at work.

43. After her August 2016 surgery, Ms. Stone also developed a dry cough.

44. Ms. Stone coughed intermittently when she returned to work following her August 2016 surgery.

45. When she returned to office, Defendant's managers started to make comments to her such as "you do not look good" and questioned her "are you sick?", "are you okay?" and "do you have cold?".

46. Within a week after Ms. Stone's return to work, in or about mid-October 2016, Defendant's Administrative Director of Maternal Child Health, Susan Bowen ("Director Bowen"), without any prior discussion, asked Ms. Stone to swap her NICU manager position with Defendant's nurse educator, Kristen Trawinski ("Ms. Trawinski"), who was more than 25 years younger than Ms. Stone.

47. Director Bowen told Ms. Stone that the nurse educator job would be easier for her than the NICU manager job.

5

48. Director Bowen was Ms. Stone's direct superior.

49. Ms. Stone declined the job swap request.

50. Ms. Trawinski had no prior experience in NICU management.

51. In mid-December 2016, after a further diagnostic testing with her oncologist, Ms. Stone was informed of a new suspicious growth in a different lobe of her lung.

52. Ms. Stone was told that she would need to undergo another lung cancer treatment and surgery after a series of tests, including PET and CT scans.

53. Starting mid-December 2016, Ms. Stone was on a new medication regimen to prepare for the series of test.

54. Ms. Stone informed Director Bowen of her new diagnosis and needed treatment.

55. Approximately a week later in late-December 2016, Ms. Stone was told by the administrative assistant to Defendant's Senior Vice President of Patient Care and Chief Nursing Officer, JoAnn Ioannou ("CNO Ioannou") that CNO Ioannou wanted to meet Ms. Stone.

56. CNO Ioannou was not employed by Defendant when Ms. Stone was hired.

57. The administrative assistant to CNO Ioannou informed Ms. Stone that a meeting would be arranged soon.

58. Subsequently, the administrative assistant to CNO Ioannou arranged for meetings at least six different times with Ms. Stone, but each time, it was cancelled by the administrative assistant.

59. No reason was given to Ms. Stone for the cancellations of the scheduled meetings.

60. In first week of January 2017, in a regular status meeting with Director Bowen, Director Bowen asked, at the end of the meeting, whether Ms. Stone would reconsider swapping her job with the nurse educator job held by Ms. Trawinski.

61. Director Bowen once again told Ms. Stone that the educator job would be an easier job for

Ms. Stone.

62. Director Bowen also made a comment about Ms. Stone's physical appearance that she looked to be very stressed earlier in the day.

63. Ms. Stone responded that she did not want to become the nurse educator and swap jobs with Ms. Trawinski.

64. The nurse educator position was a demotion in terms of responsibilities and scope of authority.

65. Director Bowen was visibly displeased with Ms. Stone's answer.

66. Director Bowen stated that "I am trying to save your job."

67. Director Bowen then angrily walked away from Ms. Stone.

68. No one else was present to witness this conversation.

69. Four days later, on or about January 9, 2017, Ms. Stone was directed to attend a meeting with CNO Ioannou and Director Bowen.

70. At the meeting, both CNO Ioannou and Director Bowen instructed Ms. Stone to seriously consider the offer to swap her NICU manager job with the nurse educator job held by Ms. Trawinski.

71. Both CNO Ioannou and Director Bowen told Ms. Stone that they wanted Ms. Stone to accept the nurse educator job.

72. Ms. Stone felt very overwhelmed, intimidated, harassed, and pressured. She did not want to be demoted to a position of lesser responsibilities.

73. Ms. Stone merely responded to them that she would think about it.

74. Nothing else was discussed at the meeting.

75. Three days later, on or about January 12, 2017, Ms. Stone asked for a meeting and met with Defendant's then Interim Senior Vice President of Human Resources, Ellery Joyeau ("HR VP

Joyeau").

76. In the meeting, Ms. Stone informed HR VP Joyeau that she felt threatened and was being forced by CNO Ioannou and Director Bowen to swap her NICU manager job with the nurse educator job.

77. Ms. Stone informed HR VP Joyeau that did not want to take the nurse educator job position.

78. Ms. Stone told HR VP Joyeau that she suspected that Defendant was forcing her to do it because of her cancer or age.

79. He merely shrugged his shoulders and responded to the effect that it would not be easy for Ms. Stone if she did not take the nurse educator job and strongly urged her to accept it.

80. HR VP Joyeau also promised Ms. Stone that if she accepted the job, she would not have to serve a probationary period in the new position.

81. The next day, on or about January 13, 2017, CNO Ioannou and Director Bowen approached Ms. Stone and asked again if she would change her position as requested.

82. Ms. Stone responded that she would think about it and respond shortly.

83. About five days later, on or about January 18, 2017, Ms. Stone was summoned into a meeting with CNO Ioannou and Director Bowen.

84. Once again, Ms. Stone was told forcefully that she should accept the nurse educator job.

85. Ms. Stone stated that she did not want to swap jobs because the education position was less secure.

86. She stated that from her experience, an educator position was one of the first positions to be eliminated in economic or corporate restructuring or reorganization.

87. When Ms. Stone explained her reasons for not wanting the job swap, CNO Ioannou sat slouched in her chair and appeared not pleased.

8

88. Immediately after Ms. Stone explained her reasoning, CNO Ioannou told Ms. Stone, in a stern voice that, "you do not get it, you are not going to be the manager of the NICU anymore."

89. CNO Ioannou added that Ms. Stone had no other option but to take the nurse educator job.

90. Ms. Stone was then placed in the nurse educator job.

91. Ms. Stone needed the job to pay for her medical bills, cancer treatments, and her past and upcoming surgeries, so did not further refuse the job.

92. The nurse educator job was a position of far less responsibility and authority than the NICU manager position.

93. When Ms. Stone was the NICU manager, she had 40 subordinates reporting to her.

94. The nurse educator had no staff.

95. As the NICU manager, Ms. Stone had been involved and participated in major organizational meetings and goal-settings of Defendant.

96. Further, the nurse educator job was not even housed in the hospital. It was located in an office building a couple blocks away from the hospital.

97. Director Bowen told Ms. Stone that she was to start as the nurse educator on February 12, 2017 and that she was to report to Defendant's Administrative Director of Professional Practice, Lynn Marie Bullock ("Director Bullock").

98. On or around January 25, 2017, during an informal discussion with Defendant's then educator, Ms. Trawinski, Ms. Stone was told by Ms. Trawinski that Director Bullock was not happy with the decision of Ms. Stone taking over the educator position.

99. Ms. Stone started her duties as an educator on or about February 12, 2017.

100. During the transition period, Ms. Stone was given a makeshift office space in the hospital to work.

9

101. The office space had no computer or phone.

102. As a result, Ms. Stone resorted to working from the hospital's library where there was a computer.

103. Ms. Stone was never provided with any formal paperwork outlining her job descriptions and responsibilities as a nurse educator.

104. Around the same time, due to her increasing shortness of breath when walking, Ms. Stone asked Director Bowen for an accommodation to use a disabled parking spot closer to the hospital so that she did not need to walk far from her car to the hospital.

105. Director Bowen asked Ms. Stone to forward her request to Defendant's security department.

106. Ms. Stone went to Defendant's security department and sought an accommodation to use a closer disabled parking spot.

107. As a proof of disability, Ms. Stone provided the Maryland State-issued disability certificate to the security department.

108. The security department denied Ms. Stone's accommodation request and told her to get an approval from Defendant's employee health department.

109. Ms. Stone forwarded her accommodation request to the employee health department.

110. Ms. Stone specifically reported that she had lung cancer and suffered from shortness of breath due to the long walk from her then assigned parking spot to hospital.

111. Ms. Stone provided the employee health department with a copy of her Maryland State-issued disability certificate

112. The employee health department denied Ms. Stone's accommodation request.

113. The employee health department directed. Ms. Stone to get a letter from her treater certifying Ms. Stone's condition.

114. Towards the end of February 2017, both Director Bowen and Director Bullock told Ms.
Stone that Ms. Stone had to stay away from the NICU department in order for there to be a
"clean break".

115. Director Bowen told Ms. Stone that she did not want Ms. Stone to create "chaos".

116. Ms. Stone responded that she only went to the NICU department once, and even then with
the prior knowledge of Ms. Trawinski and NICU department's charge nurse.

117. Ms. Stone told them that she only went there, in her capacity as a nurse educator, to update
the NICU department's code cart.

118. On or about March 9, 2017, Ms. Stone obtained and presented Defendant's employee health
department with a note from her treater.

119. The doctor's note, in part, stated:

> EVA STONE HAS HISTORY OF OVER 40 YEARS WITH MODERATELY
> SEVERE ASTHMA WITH PAST ADMISSION TO HOSPITAL
> IN ADDITION HAD A DIAGNOSIS OF LUNG CANCER … SHE HAS HAD
> RECURRENT PERIODS OF SHORT OF BREATH
> AND INFILTRATIVE PROCESS OF THE LUNG… SHE IS UNABLE TO
> WALK LONG DISTANCES
> ONE SUCH ISSUE IS THE DAILY WALKING DISTANCE FROM THE
> PARKING LOT TO HOSPITAL AND BACK
> SHE HAS A PORTABLE OXYGEN TANK AND REQUIRES USE WHEN
> WHEEZES OR SORT OF BREATH
> THUS SHE IS UNABLE TO CURRENTLY PARK IN A LOT A LONG
> DISTANCE FROM THE HOSPITAL
> SHE NEEDS TO BE PARKING IN AN AREA CLOSEST TO HOSPITAL SUCH
> AS A HANDICAP PARKING SPACE CLOSEST SPACE TO HOSPITAL
> … THIS IS A LONG TERM FOR LIFE SITUTION

120. Defendant did not timely respond to this accommodation request.

121. However, the request was finally granted on March 16, 2017.

122. A few dates later, Ms. Stone was surprisingly told by Defendant office that she had to
formally apply for the nurse educator job.

123. Ms. Stone was shocked by the request and called HR VP Joyeau stating that this request was contrary to what Defendant had promised previously.

124. HR VP Joyeau told Ms. Stone that she had to apply online at Defendant's webpage for the educator job for "formality".

125. Ms. Stone searched for a link online to apply for the nurse educator job, but did not find any such link or posting for the job.

126. Ms. Stone then told HR VP Joyeau that there was no online position posted.

127. HR VP Joyeau created a job posting link for Ms. Stone and instructed Ms. Stone to re-try.

128. Ms. Stone did as instructed and applied for the nurse educator job.

129. The online application went straight to Director Bullock.

130. Defendant never responded to the application submitted by Ms. Stone.

131. On March 18, 2017, Ms. Stone was suddenly suspended from work.

132. On that day, Ms. Stone attended an external all-day education conference, when she received a text from Director Bowen to call her.

133. When Ms. Stone called Director Bowen, Director Bowen stated that there was a discrepancy with the "Professional" Visa credit card ("P-Card") that was given to Ms. Stone to administer when she was the NICU manager.

134. P-Cards are given for managers to recognize their members of staff for going above and beyond their respective duties.

135. Ms. Stone responded that she used the P-Card to purchase gift certificates from Defendant's gift shop located in the hospital.

136. Director Bowen responded that Ms. Stone should not have purchased gift certificates as they were considered monetary.

12

137. Ms. Stone explained that she had previously explained in several meetings with Director Bowen, and emails to Director Bowen, Defendant's Compensation Manager, Janet Quigley, and Ms. Trawinski, explaining how she spent the P-Card money in Defendant's gift shop.

138. Ms. Stone noted that no one responded to her that she had done anything wrong.

139. Director Bowen stated that Ms. Stone was suspended immediately and was being investigated.

140. Defendant did not give Ms. Stone any written document advising her of her suspension, let alone a written reason for her suspension.

141. No one ever explained why Defendant was looking at something that occurred months earlier.

142. Defendant did not interview Ms. Stone as part of any investigation.

143. Defendant did not ask any questions of Ms. Stone.

144. Defendant did not tell Ms. Stone what it meant by using the term "discrepancy" with the P-Card.

145. On or about March 28, 2017, Ms. Stone was called at home to come in for a meeting with Director Bowen, Director Bullock and Defendant's HR Business Partner, Marsha Lutz.

146. When Ms. Stone arrived at the meeting, she was immediately terminated and was told by Director Bowen that "it is not working out".

147. Director Bowen accused Dr. Stone of sabotaging the new NICU manager, Ms. Trawinski.

148. Defendant's managers said nothing about the alleged "discrepancy with the P-Card".

149. Defendant asked no questions of Ms. Stone.

150. Defendant did not give Ms. Stone an opportunity to respond.

151. When Ms. Stone tried to explain that Defendant's gift shop manager, Patty Daley, assured

Ms. Stone that no one could exchange the gift certificates for money, Director Bowen merely said, "it does not matter."

152. When Ms. Stone tried to explain that Ms. Daley told her that Defendant's other units and departments have bought gift certificates in past, Director Bowen merely said, "it does not matter."

153. When Ms. Stone asked why there was no prior discussion with her about her termination, Director Bowen shocked Ms. Stone by stating that Defendant was able to fire her at any time and without any notice or warning because Ms. Stone was a probationary employee.

154. Defendant previously represented that Ms. Stone did not have to serve a probationary period of employment for nurse educator job.

155. Defendant never told Ms. Stone that she was on probation at any time she was serving as the nurse educator.

156. Ms. Stone told Director Bowen that she had outstanding record of work performance as NICU manager for more than five years, Director Bowen responded that, "nothing else mattered."

157. Ms. Stone was ordered to leave Defendant's premises.

158. Defendant replaced Ms. Stone with a much younger and non-disabled employee in her mid-30s.

159. Defendant, in an attempt to cover-up its unlawful disability and age bias, gave Ms. Stone false and pretextual reasons for her termination.

160. Ms. Stone did not make the decision to award gift certificates.

161. NICU's work-life council made the decision to award gift certificates from Defendant's gift shop.

162. Director Bowen was notified in the December 2016 status meeting that the NICU staff members had voted to receive gift certificates from Defendant's gift shop.

163. Director Bowen said okay to the decision.

164. Defendant knew that the NICU work-life council made the decision to award the gift certificates using budgeted money on the P-Card.

165. Further, Ms. Stone had at least two meetings with Director Bowen in December 2016 and January 2017 discussing with her the work-life council's decision to award gift certificates from Defendant's gift shop.

166. Director Bowen did not tell Ms. Stone that it was against Defendant's policy to award gift certificates.

167. On January 18, 2017, Defendant's Compensation Manager, Janet Quigley, emailed Ms. Stone specifically asking her to spend the budgeted money for the NICU work-life council and stated, "you haven't spent anything yet? Get on it!!!!!!!!!!!!!!!!"

168. On February 16, 2017, Ms. Stone emailed Compensation Manager Quigley, copying Director Bowen and Ms. Trawinski in, expressly stating that a decision was made to award "gift certificate(s) to the [Defendant's] gift shop".

169. In the same email, Ms. Stone sent copies of the recipient's award letters with the amount of the awarded gift certificates.

170. No one responded or even hinted to Ms. Stone that it was against Defendant's policy to award gift certificates, be it for Defendant's own gift shop or for any other external establishments.

171. In fact, Compensation Manager Quigley responded by stating, "[n]ice job EVA. Really nice!!!".

172. Ms. Trawinski responded by stating, "[t]hat's fantastic!".

173. On March 15, 2017, Ms. Stone received an email from Defendant's auditor, Robert Love, that she needed to upload the receipts for the gift certificate transactions.

174. Defendant's auditor did not say or even hint that Ms. Stone violated any policy.

175. Immediately, on the same day, Ms. Stone spoke to the auditor and sent an email that a computer issue prevented the uploading of the receipts. Ms. Stone rectified the issue and uploaded the required receipts.

176. Defendant terminated Ms. Stone for false reasons to cover-up its discrimination against her.

177. Defendant terminated Ms. Stone due to her disability and age.

178. Ms. Stone had a disability that substantially interfered with the major life activities of cardiovascular, and/or circulatory functioning.

179. Ms. Stone was substantially limited in the major life activities of breathing, walking, running, performing manual tasks and physical recreation, to name just a few.

180. During all time periods relevant to this case, Ms. Stone was a qualified disabled person under the ADA, with or without accommodation.

181. Ms. Stone suffered from disabilities that were neither minor nor transitory.

182. Ms. Stone's treater's note states that her disability was a "LONG TERM FOR LIFE SITUATION."

183. Ms. Stone has received ongoing and regular medical care, treatment, and monitoring since her lung cancer diagnosis in August 2016.

184. Ms. Stone had a record of history of being disabled after her lung cancer surgery and treatment in August 2016.

185. Defendant regarded Ms. Stone as disabled by refusing to allow her to continue her NICU

manager job and by not allowing her to work in her new educator job and terminating her.

186. There was no legitimate, non-discriminatory reason, for Defendant's termination of Ms. Stone.

187. At the time of her termination, Ms. Stone was more than 68 years old.

188. Ms. Stone has been damaged financially, professionally and emotionally because of Defendant's unlawful actions against her.

189. Ms. Stone suffered lost wages and benefits as a result of her discriminatory termination.

190. Ms. Stone suffered humiliation, anguish and extreme worry due to the Defendant's unlawful conducts against her.

191. Ms. Stone had worked all of her adult life.

192. Ms. Stone loved and excelled in the nursing profession.

193. Defendant caused Ms. Stone to be unemployed and without a source of income.

194. Defendant poisoned Ms. Stone's work record by terminating for a bogus reason.

195. After Ms. Stone's firing, Defendant got hold of Ms. Stone's personal USB flash-drive from her office and deleted all of the files Ms. Stone saved in the drive.

196. GBMC did not ask for approval to delete Ms. Stone's data.

197. The files in the flash-drive included personal and professional materials Ms. Stone acquired through decades of her professional career, including before her Defendant's hiring.

198. Defendant returned a blank USB flash-drive to Ms. Stone.

199. The loss of the valuable personal and professional materials stored in the USB flash-drive hindered Ms. Stone in not getting comparable subsequent employment after Defendant's firing.

200. Defendant's discrimination and retaliatory conduct against Ms. Stone was malicious, willful

and intentional.

201. Defendant acted with malice and evil intent against Ms. Stone.

202. Defendant's actions violated its own policies that prohibit discrimination and retaliation.

203. Ms. Stone was subjected to great financial and emotional distress due to the Defendant's malicious and unlawful actions against her.

## ACTION BEFORE THE MCCR & EEOC

204. Ms. Stone timely filed a charge of discrimination with the EEOC, charging Defendant with disability and age discriminations and retaliation.

205. The EEOC, due to a work-sharing agreement between them, transferred Ms. Stone's charge to the Maryland Commission on Civil Rights ("MCCR").

206. During MCCR's fact-finding conference, Defendant piled-up more and new reasons for Ms. Stone's termination.

207. Defendant said that pursuant to its policy, all purchases exceeding $25 must be done through the payroll department and that Ms. Stone violated the policy.

208. However, Defendant did not provide a copy of the policy.

209. Defendant further said Ms. Stone used its corporate credit card to get gas, despite Ms. Stone almost immediately informing Defendant's accounts department, that she inadvertently used and refunded the money by check to the accounts department. This incident occurred sometime in January 2017 and never once was mentioned before.

210. Immediately when the inadvertent gas incident occurred, Ms. Stone informed and apologized to Director Bowen that she used the corporate credit card by mistake. Director Bowen said okay to it.

211. On April 27, 2020, Ms. Stone was issued an EEOC right to sue notice.

18

212. Ms. Stone has timely filed this lawsuit.

## JURISDICTION & VENUE

213. Jurisdiction in this Court is proper because this case presents a federal question under the ADA and ADEA.

214. Venue in this District is proper because the unlawful acts occurred in this District and because Ms. Stone worked for Defendant in this District.

## VIOLATIONS OF LAW

### COUNT I -- UNLAWFUL DISABILITY DISCRIMINATION, ADA VIOLATIONS

215. All allegations of this Complaint are expressly incorporated into this claim that Ms. Stone is asserting under the ADA.

216. Ms. Stone was a qualified individual with a disability and was, at relevant times, able to work and perform in her NICU manager and nurse educator positions.

217. Defendant discriminated against Ms. Stone on account of her disability and/or her record of disability, and/or because Defendant regarded her as disabled.

218. Ms. Stone was at all times able to perform the essential functions of her NICU manager job.

219. Defendant at no time indicated that Ms. Stone was not able to perform any of the essential functions of her NICU manager job.

220. Ms. Stone successfully performed her NICU manager job for more than five years.

221. Ms. Stone was for more than a satisfactory employee in her NICU manager position.

222. A month after Defendant was made aware of Ms. Stone's lung cancer diagnosis and surgery, Defendant asked Ms. Stone to swap jobs, which she refused.

223. Almost immediately after Defendant was made aware of Ms. Stone's new growth and the

need to attend future treatment and tests, Ms. Stone was forced to accept a demotion to the nurse educator job.

224. In addition to being forced to accept the demotion, Ms. Stone was threatened by Defendant that she would lose job if she does not agree to it.

225. After Ms. Stone was placed in the nurse educator position, she was not provided with a computer or phone.

226. After Ms. Stone was placed in the nurse educator position, she was barred from the NICU department.

227. Ms. Stone was never provided with any formal paperwork outlining her job descriptions and responsibilities as a nurse educator.

228. Ms. Stone was at all times able to perform the essential functions of the educator job.

229. Defendant at no time indicated that Ms. Stone was not able to perform any of the essential functions of the educator job.

230. Ms. Stone was also not provided with a disabled parking spot close to the hospital building despite Defendant's knowledge that she suffered from shortness of breath due to the long walk from her assigned parking spot to her makeshift office in the hospital.

231. Ms. Stone was not provided with a disabled parking spot even after she provided two Defendant's departments with Maryland State-issued disability certificate.

232. Just a few days after Ms. Stone submitted her treater's note to Defendant which stated that her disability was a long term for life situation, Ms. Stone was suddenly directed to apply "formally" for the nurse educator position.

233. A week after Ms. Stone handed her treater's note to Defendant which stated that her disability was a long term for life situation, Ms. Stone was suspended.

234. The suspension was the first form of discipline against Ms. Stone in her more than 5 ½ years employment history with Defendant.

235. About ten days later, without according her with an opportunity to respond to accusations leveled against her, Ms. Stone was terminated.

236. Ms. Stone was not even allowed to defend herself in the termination meeting.

237. Defendant offered pretextual reasons for Ms. Stone's termination in an effort to cover-up its disability discrimination against her.

238. Ms. Stone suffered wage and benefit losses as a result of the discriminatory actions of the Defendant.

239. Ms. Stone suffered compensatory and consequential damages as a result of the discriminatory actions of the Defendant.

240. Ms. Stone suffered compensatory damages, including emotional pain and suffering, worry, and anxiety due to the Defendant's disability discrimination.

241. Punitive damages should be assessed against the Defendant because of its' intentional and/or reckless disregard of Ms. Stone's right to be free of disability discrimination at work.

242. Relief Requested – Ms. Stone respectfully requests that she be (a) awarded her lost wages and benefits; (b) reinstated and, if not reinstated, awarded front pay; (c) awarded compensatory, punitive and consequential damages; and (d) awarded her attorney fees and costs. Pre- and post-judgment interest is also requested.

## COUNT II – UNLAWFUL AGE DISCRIMINATION, ADEA VIOLATION

243. All allegations of this Complaint are expressly incorporated into this claim that Ms. Stone is asserting under the ADEA.

244. Ms. Stone was more than 68 years of age when she was terminated.

245. After Ms. Stone was removed from the NICU manager job, she was replaced by a person who was in her mid-30s.

246. The new NICU manager was at 25 years younger than Ms. Stone.

247. The new NICU manager had no experience whatsoever in NICU management.

248. Defendant hired a new far younger employee in her mid-30s to assume the educator position after it fired Ms. Stone.

249. Defendant demoted, suspended and terminated Ms. Stone because of her age.

250. After Ms. Stone was terminated from the Nurse Educator job, she was replaced by a person who was in her mid-30s.

251. Defendant offered pretextual reason for Ms. Stone's termination to cover-up the age discrimination it inflicted on Ms. Stone.

252. Ms. Stone suffered lost wages and benefits due to Defendant's discriminatory actions.

253. Defendant intentionally and willfully violated the ADEA.

254. Defendant did not obtain "advice of counsel" before terminating Ms. Stone.

255. Relief Requested – Ms. Stone respectfully requests that she be (a) awarded her lost wages and benefits; (b) reinstated and, if not reinstated, awarded front pay; (c) awarded liquidated and consequential damages; and (d) awarded her attorney fees and costs. Pre- and post-judgment interest is also requested.

## COUNT III – UNLAWFUL ADA RETALIATION VIOLATION

256. All allegations of this Complaint are expressly incorporated into this Count III.

257. Ms. Stone was retaliated against after she complained of disability discrimination to Defendant's Interim Senior Vice President of Human Resources that she was being discriminated against due to her disability.

258. Ms. Stone's complaint to the Vice President was an act of engaging in protected conduct.

259. Ms. Stone's accommodation request for a disabled parking spot was not allowed due to the retaliation.

260. There was a clear causal connection between Ms. Stone's protected activity and her termination.

261. Ms. Stone's terms of employment were altered, and she had to apply formally for the job Defendant already placed her in due to the retaliation.

262. Ms. Stone's terms of employment was altered and she had to undergo probationary period despite being offered a position without probation due to the retaliation.

263. Ms. Stone was terminated without any notice or warning as a result of the retaliation.

264. Ms. Stone suffered lost wages and benefits due to Defendant's malicious, reckless and intentional unlawful retaliation.

265. Ms. Stone suffered compensatory damages.

266. Ms. Stone is entitled to an award of punitive damages.

267. Relief Requested – Ms. Stone respectfully requests that she be (a) awarded her lost wages and benefits, (b) reinstated and, if not reinstated, awarded front pay; (c) awarded compensatory, punitive and consequential damages; and (d) awarded her attorney fees and costs. Pre- and post-judgment interest is also requested.

## COUNT IV – UNLAWFUL ADEA RETALIATION VIOLATION

268. All the allegations of this Complaint are expressly incorporated into this Count IV.

269. Defendant willfully violated the ADEA.

270. Ms. Stone engaged in protected opposition, activity and conduct by complaining to Defendant's Interim Senior Vice President of Human Resources that she was being

discriminated against due to her age.

271. The retaliation against Ms. Stone included the demotion, suspension and termination.

272. A direct causal connection exists between the Ms. Stone's protected conduct and the resulting retaliation and adverse employment actions.

273. Defendant articulated false reasons for the adverse actions it took against Ms. Stone to cover-up the unlawful retaliation.

274. Ms. Stone suffered lost wages and benefits as a direct result of the retaliation.

275. Ms. Stone suffered loss of advancement opportunities as a direct result of the retaliation.

276. Relief Requested – Ms. Stone respectfully requests that she be (a) awarded her lost wages and benefits; (b) reinstated and, if not reinstated, awarded front pay; (c) awarded liquidated damages; and (d) awarded her attorney fees and costs. Pre- and post-judgment interest is also requested.

Respectfully submitted,

Stephen B. Lebau (Bar # 07258)
LEBAU & NEUWORTH, LLC
606 Baltimore Avenue – Suite 201
Towson, Maryland 21204
tel. 443.273.1203
fax. 410.296.8660
sl@joblaws.net
*Attorneys for Plaintiff*

## REQUEST FOR JURY TRIAL

Plaintiff requests that a jury of her peers hear and decide this case.

Respectfully submitted,

Stephen B. Lebau (Bar # 07258)

24